Submitted on the record and petition for review of Ballot Measure Explanatory Statement filed August 12, Ballot Measure Explanatory Statement certified as modified September 2, 1994

Warren C. DERAS,
*Petitioner,*

*v.*

Phil KEISLING,
Secretary of State
of the State of Oregon,
Joel Ario, Harry Lonsdale, Dave Moss,
Steve Lanning, and Annette Talbot,
*Respondents.*

(SC S41545)

879 P2d 850

Warren C. Deras, Portland, filed the petition *in propria persona.*

Michael D. Reynolds, Assistant Solicitor General, Salem, waived appearance for respondent Phil Keisling.

No appearance for respondents Joel Ario, Harry Lonsdale, Dave Moss, Steve Lanning, and Annette Talbot.

Before Carson, Chief Justice, and Gillette, Van Hoomissen, Fadeley, Unis, and Durham, Justices.

GILLETTE, J.

## GILLETTE, J.

This is an original proceeding for judicial review of a Ballot Measure Explanatory Statement[1] for Ballot Measure 9, a proposed statutory enactment that is to be submitted to the voters at the general election in November. Petitioner is a person dissatisfied with the Explanatory Statement and who therefore has standing under ORS 251.235 to bring this proceeding. Respondent Keisling, as Secretary of State, is responsible for placing an Explanatory Statement for the ballot measure in the Voters' Pamphlet. The other respondents make up the committee that, pursuant to ORS 251.215, prepared the Explanatory Statement. The measure, entitled "The Oregon Campaign Finance Reform Act," creates a number of new statutory provisions and amends a number of present statutory provisions governing the financing of state and local election campaigns in Oregon. We conclude that the Explanatory Statement is deficient in two of the respects argued by petitioner. We therefore certify a modified Explanatory Statement.

The proposed measure, which consists of 26 sections, is too voluminous to be reprinted here. To the extent necessary, we shall discuss pertinent portions of the proposed measure in connection with specific arguments advanced by petitioner.

The committee created to write an Explanatory Statement for the measure filed the following statement:

> "Measure 9 revises laws relating to the financing of election campaigns. Major provisions of the measure include limits on amounts that could be contributed to certain candidates, optional limits on the amount those candidates could spend at the primary and general elections and a ban on certain political contributions. The measure would not apply to federal, local and ballot measure elections.
>
> "*Contribution Limits*
>
> "At each election, a person or political action committee (PAC) could contribute no more than $500 to a candidate for

---

[1] For a description of Explanatory Statements, their purpose, and the manner in which they are prepared, see *Teledyne Industries v. Paulus*, 297 Or 665, 667-69, 687 P2d 1077 (1984). For a discussion of this court's methodology in examining its scope of review concerning Explanatory Statements, see *June v. Roberts*, 310 Or 244, 247-48, 797 P2d 357 (1990).

statewide office and no more than $100 to a candidate for the legislature. An individual could contribute no more than $100 to a PAC each year.

"At each election, political parties could contribute no more than $25,000 to a candidate for Governor, $10,000 to a candidate for certain other statewide offices and $5,000 to a candidate for the legislature. An individual could contribute no more than $1,000 to a political party each year.

"Contribution limits would be waived if an opponent spends personal funds in excess of $25,000 for a statewide office or $10,000 for a legislative office. Any violation of the contribution limits could be penalized by fines up to $1,000 or three times the amount of the excess contribution.

"*Expenditure Limits*

"The measure sets optional expenditure limits for candidates for statewide office and legislative office as follows:

| Position | Primary Election: | General Election: |
|---|---|---|
| Governor | $500,000 | $1,000,000 |
| Other Statewide | $200,000 | $400,000 |
| State Senate | $30,000 | $60,000 |
| State House | $20,000 | $40,000 |

"The Voters' Pamphlet would indicate whether each candidate has chosen to limit expenditures. The limits would be waived if any opposing candidate did not agree to limit expenditures or exceeded the expenditure limit. A candidate who agreed to limit expenditures and exceeded the limit could be fined up to twice the amount of the excess expenditure and be subject to other penalties.

"*Other Provisions*

"Most 'pass-through' contributions between candidates, between candidates and PACs and between PACs would be prohibited.

"Corporations and labor organizations would be prohibited from making direct contributions to candidates.

"The measure defines terms such as 'contribution' and 'expenditure.' The measure sets rules for determining when expenditures are independent of a candidate and when they are made in cooperation with a candidate. If expenditures are not independent, they would count as contributions to the candidate and expenditures by the candidate. Independent expenditures in excess of $25,000 for statewide office or

$10,000 for legislative office would have to be reported to the Secretary of State and the candidates.

"Candidates could not use campaign funds for personal purposes.

"Tax credits would be eliminated for contributions to candidates who choose not to comply with the expenditure limits. Tax credits would be eliminated for contributions to certain PACs."

■ . An Explanatory Statement placed in the Voters' Pamphlet is supposed to be "an impartial, simple and understandable statement explaining the measure." ORS 251.215. Under ORS 251.235, this court reviews challenged Explanatory Statements to determine whether they are "insufficient or unclear." A statement is "insufficient" if it is not impartial or if it is "potentially misleading." *Homuth v. Keisling*, 314 Or 214, 220, 837 P2d 532 (1992). Petitioner advances a number of arguments aimed at demonstrating that various portions of the Explanatory Statement fail the foregoing test.

■ Before addressing the substantive arguments advanced by petitioner, we first discuss two other issues raised in the petition. In the first of those issues, petitioner argues that this is not a case in which this court should extend the "deference" that it historically has accorded to what this court has described as the "legislative and political" process by which Ballot Measure Explanatory Statements are prepared by committees that are designed, through the process by which they are created, to be balanced. *See Teledyne Wah Chang Albany v. Powell*, 301 Or 590, 592-93, 724 P2d 319 (1986) (so describing the process). Instead of a "balanced" committee, petitioner argues, the one created in this instance was "loaded" in favor of the ballot measure and, as a result, produced an Explanatory Statement that is heavily biased in favor of the ballot measure.

We reject petitioner's argument that this court should, in response to his extra-record assertions concerning the makeup of the committee, exceed our statutory scope of review in these cases.

■ As a second preliminary matter, petitioner points out that, among other things, the ballot measure purports to amend several existing statutes. The difficulty with some of

those amendments, however, is that the versions of those statutes used in the ballot measure are the *1991* versions, but several of those same statutes were amended (some substantially so) or even repealed by the *1993* legislature. Petitioner asks that this court therefore "determine what the words of the amended statutes will be if the measure is enacted and reveal to the voters the changes not apparent on the face of the measure."

We agree with petitioner that a significant amount of "sorting out" may be required, should the ballot measure pass. But any such sorting out process lies well beyond the capacity of this court to perform, given the very short time frame in which this court must dispose of Explanatory Statement challenges like the present one. Unsatisfactory as that is, we perceive no practical way to deal with the problem before the election. We turn to petitioner's substantive challenges to the Explanatory Statement.

■ Petitioner asserts that, because of what he describes as a "drafting error," it is "impossible to determine what is an 'expenditure' [under the measure]." We are unclear as to what petitioner is asking us to do in this regard. As he acknowledges, the measure does contain definitions of "expenditure" in various contexts. He does not argue that the Explanatory Statement does violence to those definitions. Instead, he identifies what he regards as a potential conflict in the application of those various definitions, given one possible way of looking at them, and then figuratively throws up his hands. We decline to join him, absent a concrete challenge to what the committee wrote. If interpretative problems of the kind that petitioner describes are lurking in the measure, there will be better opportunities to sort them out in a concrete case and in the event that the measure becomes law.

■ Petitioner next asserts that two subsections of section 2 of the measure create exemptions from expenditure and contribution limits and from reporting requirements that are "destructive of effecting reporting laws" and that should, therefore, be "disclosed to the voters." Assuming (in the abstract) the validity of petitioner's premise, we note that his proposed solution is simply to add a sentence to the Explanatory Statement that says, "The measure exempts certain costs from reporting laws." That sentence would add

little, if anything, to the existing Explanatory Statement. We decline to insert it.

 Petitioner next turns to the way in which the Explanatory Statement deals with the subject of political parties and independent candidates. He says,

"The measure contains a number of provisions favoring political parties in general and major political party candidates in particular to the disadvantage of minor party and independent candidates. One of those provisions is misstated in the proposed explanation, and others are entirely omitted. They are too significant to omit."

Petitioner identifies the "misstatement" to which he refers as being the statement in the Explanatory Statement that "[a]n individual could contribute no more than $1,000 to a political party each year." That statement appears to be the committee's translation of subsection (4)(b) of section 3 of the measure. Section 3 provides in part:

"(1) Subject to section 4 of this 1994 Act and except as provided in subsection (4) of this section, with respect to a single election, a person or political committee shall not contribute an aggregate amount exceeding:

"(a) $500 to a candidate or the principal campaign committee of a candidate for nomination or election to [certain statewide offices];

"(b) $100 to a candidate or the principal campaign committee of a candidate for nomination or election to the office of State Senator or State Representative.

"* * * * *

"(3) An individual shall not contribute in any calendar year an aggregate amount exceeding $100 to any one political committee other than a principal campaign committee or a political committee organized exclusively to support or oppose one or more candidates for national or political party office or one or more measures.

"(4) Notwithstanding subsection (1) of this section:

"* * * * *

"(b) An individual shall not contribute in any calendar year an aggregate amount exceeding $1,000 to any one political committee organized by a political party."

Simply put, petitioner's position is that the committee erred in translating the phrase, "any one political committee organized by a political party," in section 3(4)(b) of the measure, to mean "political party."

We agree with petitioner. The subsection refers to one or more contributions by an individual "to any one political committee organized by a political party." Linguistically, one cannot turn something organized *by* a political party *into* that political party. Whatever the intended scope of the subsection — and that is not clear to us — the committee's explanation of it cannot be correct. As in many cases, we believe that the best solution is to modify the Explanatory Statement to reflect the wording of the measure. Accordingly, the sentence in question will be amended to read: "An individual could contribute no more than $1,000 each year to a political committee organized by a political party."

■ With respect to this same general topic, petitioner attacks the failure of the Explanatory Statement to point out the fact that the expenditure and contribution limits apply serially to major party candidates' primary and general election campaigns, thus effectively doubling the amount of permissible contributions to and increasing by 50% the expenditures permissible for such candidates as compared to their minor party opponents. That is a correct description of the way the system created by the measure will function — an accurate reflection of the differences that inhere in a system that provides for primary elections within the major parties, but does not create such a system for minor parties or their candidates unless and until those parties become major parties.

Petitioner's factual premise does not, however, lead inevitably to the conclusion that he urges. Petitioner does not direct our attention to particular wording in the Explanatory Statement — and we do not perceive anything in it — that would mislead the electorate on this score. Opponents of the measure may wish to highlight this disparate set of circumstances in their own statements in the Voters' Pamphlet, but we perceive nothing that required the committee to do so in its effort.

■ Petitioner next directs our attention to the provisions in the measure setting up fines for certain violations of its requirements. Petitioner argues that the Explanatory Statement omits two important facts. First, he argues, there is no mention that the fines are to be imposed administratively, rather than by a court. This is misleading, he says, because "the average voter reading the explanation will likely assume that the fines would be imposed by a court, subject to the right of jury trial and the other constitutional rights normally involved in criminal proceedings." We reject this argument. The fines are not described in the measure as being "criminal." Furthermore, we decline to second-guess the committee concerning the assumption that an average voter would make regarding the procedures that will accompany the imposition of a fine.

■ ■ Petitioner argues further that the absence of any requirement of a particular *mens rea* with respect to the acts that could trigger fines under the measure should be pointed out to the voters. The present Explanatory Statement says nothing concerning this subject, and that is as it should be. As a general proposition, an Explanatory Statement should concentrate on what *is* in a measure, leaving it to supporters and opponents of the measure to debate over what was omitted. The desirability of requiring a particular level of awareness before one may be fined for violation of various provisions of the measure is a classic topic for debate. Petitioner is welcome to purchase space in the Voters' Pamphlet and "have at it," but there is no justification for altering the Explanatory Statement on that basis.

■ Petitioner next attacks the committee's use of the words "optional" and "pass-through" in the Explanatory Statement. We shall not set out petitioner's argument in detail. It is sufficient to say that, in our view, the committee could have chosen to use both terms or to omit them. Petitioner's arguments do nothing more than offer reasonable rationales for making the latter choice; they do not demonstrate legal error in the former one.

■ Petitioner next challenges the statement in the Explanatory Statement that "[t]he measure would not apply to federal, *local*, or ballot measure elections." (Emphasis added.) The emphasized part of the foregoing statement is

not accurate, petitioner argues: "The contribution limits in subsections (2), (3) and (5) of section 3 apply to local elections, as do the prohibitions in sections 4 and 16." We agree with petitioner. The word will be deleted.

■ Petitioner next challenges the Explanatory Statement's assertion that "[c]andidates could not use campaign funds for personal purposes." He counters:

"While the measure contains restrictions in that regard, it is not a flat prohibition. Section 18(2) prohibits personal use of funds 'other than to defray any ordinary and necessary expenses incurred in connection with the person's duties as a holder of public office or to repay to a candidate any loan the proceeds of which were used in connection with the candidate's campaign.' These permitted expenses could include such personal expenses as the living expenses of a legislator while in Salem during the session and meals while on official business. Most voters would consider these 'personal purposes.' "

As with many of the other arguments offered by petitioner, at least a portion of the present one boils down to a matter of opinion. The committee did not consider the repayment of a loan made by a candidate to his or her campaign to be "a personal purpose"; petitioner does. Both points of view are defensible. The one adopted by the committee is therefore not legally erroneous.

■ As to the issue of the payment of living expenses out of campaign funds, our problem is more direct: We cannot be sure, from the wording of the measure itself, that petitioner's example of a kind of expenditure that would be permitted under the measure is correct. It may or may not be and, as such, belongs in an argument for or against the measure. It is not an appropriate assumption from which to alter the Explanatory Statement.

■ Finally, petitioner argues that, given the complex nature of the measure, the Explanatory Statement should have utilized the entire 500 words available. Abstractly, we might be inclined to agree. But petitioner's proposed alternative is not an improvement, and we are not in a position to conduct an exercise in writing an Explanatory Statement on

our own. With the exception of the two modifications previously noted, therefore, we certify the Explanatory Statement as it was prepared by the committee.

We certify the following Explanatory Statement:

Measure 9 revises laws relating to the financing of election campaigns. Major provisions of the measure include limits on amounts that could be contributed to certain candidates, optional limits on the amount those candidates could spend at the primary and general elections and a ban on certain political contributions. The measure would not apply to federal and ballot measure elections.

*Contribution Limits*

At each election, a person or political action committee (PAC) could contribute no more than $500 to a candidate for statewide office and no more than $100 to a candidate for the legislature. An individual could contribute no more than $100 to a PAC each year.

At each election, political parties could contribute no more than $25,000 to a candidate for Governor, $10,000 to a candidate for certain other statewide offices and $5,000 to a candidate for the legislature. An individual could contribute no more than $1,000 each year to a political committee organized by a political party.

Contribution limits would be waived if an opponent spends personal funds in excess of $25,000 for a statewide office or $10,000 for a legislative office. Any violation of the contribution limits could be penalized by fines up to $1,000 or three times the amount of the excess contribution.

*Expenditure Limits*

The measure sets optional expenditure limits for candidates for statewide office and legislative office as follows:

| Position | Primary Election: | General Election: |
|---|---|---|
| Governor | $500,000 | $1,000,000 |
| Other Statewide | $200,000 | $400,000 |
| State Senate | $30,000 | $60,000 |
| State House | $20,000 | $40,000 |

The Voters' Pamphlet would indicate whether each candidate has chosen to limit expenditures. The limits would be waived if any opposing candidate did not agree to limit expenditures or exceeded the expenditure limit. A candidate who agreed to limit expenditures and exceeded the limit

could be fined up to twice the amount of the excess expenditure and be subject to other penalties.

*Other Provisions*

Most "pass-through" contributions between candidates, between candidates and PACs and between PACs would be prohibited.

Corporations and labor organizations would be prohibited from making direct contributions to candidates.

The measure defines terms such as "contribution" and "expenditure." The measure sets rules for determining when expenditures are independent of a candidate and when they are made in cooperation with a candidate. If expenditures are not independent, they would count as contributions to the candidate and expenditures by the candidate. Independent expenditures in excess of $25,000 for statewide office or $10,000 for legislative office would have to be reported to the Secretary of State and the candidates.

Candidates could not use campaign funds for personal purposes.

Tax credits would be eliminated for contributions to candidates who choose not to comply with the expenditure limits. Tax credits would be eliminated for contributions to certain PACs.

Ballot Measure Explanatory Statement certified as modified.

Pursuant to ORAP 1.20(4) and notwithstanding ORAP 11.30(9), this opinion will become effective when the appellate judgment issues. The State Court Administrator shall issue the appellate judgment on September 7, 1994, unless a petition for reconsideration is both filed with and physically received by the Office of the State Court Administrator by 5 p.m. on September 6, 1994. A timely petition for reconsideration will stay issuance of the appellate judgment until the court acts on all timely petitions for reconsideration.